**IN THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF ALABAMA**

| | | |
|---|---|---|
| MARTHA KING, | ) | |
| | ) | |
| **Claimant,** | ) | |
| | ) | |
| v. | ) | **CIVIL ACTION NO.** |
| | ) | **2:17-CV-00232-KOB** |
| NANCY A. BERRYHILL, | ) | |
| ACTING COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| **Respondent.** | ) | |

**MEMORANDUM OPINION**

**I. INTRODUCTION**

On September 12, 2013, the claimant, Martha Nell King, filed a Title II application for a

period of disability and disability insurance benefits, and a Title XVI application for

supplemental security income. The claimant alleged disability commencing on August 12, 2013

because of degenerative disc disease, seizures, and pain. The Commissioner denied the claim on

January 15, 2014. The claimant filed a timely request for a hearing before an Administrative Law

Judge, and the ALJ held a hearing on June 11, 2015. (R. 26-46, 47, 48, 57, 113-16, 119-25).

In a decision dated October 26, 2015, the ALJ found that the claimant was not disabled as

defined by the Social Security Act and was, therefore, ineligible for social security benefits. On

December 12, 2016, the Appeals Council denied the claimant's request for review.

Consequently, the ALJ's decision became the final decision of the Commissioner of the Social

Security Administration. The claimant has exhausted her administrative remedies, and this court

has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below,

this court AFFIRMS the decision of the Commissioner. (R. 1-5, 10-21).

## II. ISSUES PRESENTED

The claimant presents the following issues for review:

1.      whether the ALJ properly assessed the claimant's subjective complaints; and

2.      whether the ALJ accorded proper weight to the opinions of the claimant's treating physician, Dr. Okor.

## III. STANDARD OF REVIEW

The standard of reviewing the Commissioner's decision is limited. This court must affirm the ALJ's decision if he applied the correct legal standards and if substantial evidence supports his factual conclusions. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

The court must keep in mind that opinions such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors "are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets the listing and is qualified for Social Security disability benefits is a

question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual finding." *Walker*, 826 F.2d at 999. A reviewing court must not only look to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of the evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F. 2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

In evaluating pain and other subjective complaints, the Commissioner must consider whether the claimant demonstrated an underlying medical condition, and *either* (1) objective medical evidence that confirms the severity of the alleged pain arising from the condition *or* (2) that the objectively determined medical condition is of such a severity that it can reasonably be expected to give rise to the alleged pain. *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). Once the claimant establishes an impairment, the ALJ must consider all evidence about the intensity, persistence, and functionally limiting effects of pain or other symptoms in deciding the issue of disability. *Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995). In addition to objective medical evidence, the ALJ will consider daily activities; the location, duration, frequency, and intensity of the claimant's pain or other symptoms; precipitating and aggravating factors; medication, treatments, and other measures used to alleviate pain or other symptoms; and

functional limitations and restrictions caused by pain or other symptoms. *See* 20 C.F.R. §

404.1529.

If the ALJ decides to discredit the claimant's testimony as to her pain, he must articulate

explicit and adequate reasons for that decision. *Foote*, 67 F.3d at 1561-62. A reviewing court

will not disturb a clearly articulated credibility finding with supporting substantial evidence in

the record. *Id.* at 1562.

In considering medical opinions, the ALJ must state with particularity the weight he gave

different medical opinions and the reasons, and the failure to do so is reversible error. *Sharfarz v.*

*Bowen*, 825 F.2d 278, 279 (11th Cir. 1987); *see also MacGregor v. Bowen*, 786 F.2d 1050, 1053

(11th Cir. 1986). The ALJ must give the testimony of a treating physician substantial or

considerable weight unless "good cause" is shown to the contrary. *Crawford v. Comm'r*, 363

F.3d 1155, 1159 (11th Cir. 2004). The Commissioner may reject any medical opinion if the

evidence supports a contrary finding. *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985). If

the ALJ articulates specific reasons for failing to give the opinion of a treating physician

controlling weight and substantial evidence supports those reasons, the ALJ does not commit

reversible error. *Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005).

## V. FACTS

The claimant was forty-nine years old at the time of the ALJ's decision. The claimant has

a high school education and has past work as a driver supervisor, dispatcher, and cashier. The

claimant alleges disability beginning on August 12, 2013, based on degenerative disc disease,

seizures, and pain. (R. 21, 39-40, 48, 113, 153).

*Physical Impairments*

The claimant began experiencing neck, right shoulder, and right arm pain in September 2012. In October, she received a cervical epidural injection, which provided relief for four months. The pain returned at the end of January 2013, and the claimant received another epidural injection in February, which provided relief for two weeks. A cervical MRI on May 30, 2013, demonstrated "spondylotic changes at C4-5 and C5-6 characterized by disc bulges and disc osteophyte complexes that lead to moderate bilateral C4-5 and severe right C5-6 neural foraminal stenosis." On June 10, 2013, Dr. Mamerhi Okor commented that the claimant was in significant distress and complained of severe pain in her neck, right shoulder, and right arm; numbness in all the fingers of her right hand; and constant headaches and jaw pain. Dr. Okor also stated, "While aspects of her clinical presentation are consistent with a right C6 radiculitis, her symptoms are much more substantial tha[n] can be explained by her cervical radiologic pathology." An MRI of her right shoulder on June 17, 2013, showed a low grade partial bursal surface tear, but otherwise, was unremarkable. (R. 269, 284, 288, 470).

On August 5, 2013, an MRI of her right brachial plexus revealed no abnormality in the right brachial plexus, but showed a worsening of the spinal canal narrowing in the cervical region. Dr. Okor commented, "I still maintain that her symptom severity is out of proportion to her cervical spondylotic changes. Her shoulder MRI and NCV were rather unremarkable. It is possible that her symptoms represent an atypical presentation of her cervical spondylosis." The claimant underwent a cervical discectomy and fusion with plating at C4-5 and C5-6 on August 13, 2013. (R. 276, 303, 500).

On September 11, 2013, the claimant reported to Dr. Okor her symptoms had not improved following the surgery. Dr. Okor commented that a radiograph demonstrated an intact

internal fixation construct without evidence of hardware pullout or loosening. He also stated,

"Claimant is in no condition to work (this included sedentary duty) as she is constantly affected

by pain. I recommended that she seek disability and she may require a referral to a pain clinic for

further management." (R. 317).

On September 13, 2013, the claimant called Dr. Okor's office and requested a letter

stating she could not work. Dr. Okor completed a "Report of Disabiliy: Statement by Examining

Physician" on October 4, 2013. In the report, when asked to "[l]ist the objective findings that

render the applicant permanently incapacitated to perform the normal functions of his/her duty,"

Dr. Okor replied, "unrelenting pain." When asked "are there reasonable accommodations that

could be made by the patient's employer to allow this patient to continue his/her employment,"

Dr. Okor answered "No. [Patient] incapacitated secondary severe pain." When asked for

"[r]emarks and/or records that clarify or support your diagnosis," Dr. Okor responded, "Please

see attached clinic note," but no note was attached.   (R. 327, 551-52).

On December 11, 2013, the claimant visited Dr. Okor and reported her symptoms had not

changed. Dr. Okor reported that the claimant had trouble abducting her right arm beyond 30

degrees and was "severely pain limited." He also noted that an EMG/NCV of her right

supraspinatus muscles did not demonstrate evidence of denervation. (R. 353). On December 24,

2013, the claimant received a suprascapular nerve block for her pain. (R.353, 373).

On January 27, 2014, the claimant visited Dr. Ryan Almeida and reported that her current

pain rating was a ten out of ten; she was unable to do anything around the house because of

constant pain; and her pain medication was not working.  She also reported trouble sleeping and

feeling angry, depressed, and anxious. Furthermore, she reported occasional suicidal ideation,

but had no plan in place to commit suicide. Dr. Almeida commented that the plaintiff was

scheduled for a right suprascapular nerve block, but cancelled the procedure because she was intolerant of palpitation of her right shoulder and right arm. (R. 366).

On February 7, 2014, the claimant received a right suprascapular nerve block. On February 24, 2014, the claimant reported that the nerve block provided relief for a few hours, and during an examination, she demonstrated a markedly decreased range of motion in her right shoulder. On March 19, 2014, the claimant reported to Dr. Almeida that she could continuously sit for nine minutes; stand for one minute; and walk for thirty minutes. However, the claimant also reported that she walked three to four times per week for sixty minutes. (R. 351-52, 360, 364).

On June 4, 2014, the claimant visited Dr. James Bailey at UAB Medicine's Department of Neurology – Pain Medicine at Dr. Almeida's request. Dr. Bailey commented that the claimant's MRI of the brachial plexus was unremarkable and the MRI of her shoulder demonstrated "[l]ow grade partial bursal surface tear of the numeral insertion." The claimant reported to Dr. Bailey that her current medications, Percocet, Gabapentin, Mobic, and Cymbalta, provided no pain relief and her typical pain level was a ten out of ten. In addition, she reported that continuous standing, sitting, lifting, and walking increased her pain and no activity relieved it. Furthermore, she reported blocks and injections made her pain worse. (379-81).

Dr. Bailey stated that the claimant's deep tendon reflexes were rated a two out of four; her gait was normal; and she could heel, toe, and tandem walk without difficulty. He further noted during musculoskeletal tests that the claimant's neck movement was limited to a few degrees in any direction by neck pain, but the "claimant was able to turn her head and look at her husband spontaneously during the interview – seemingly without pain." In his diagnosis, Dr. Bailey stated, "She has clear abnormalities that would explain neck pain but not the rather

extreme limitations and pain in her right upper extremity . . . . I suspect that there is a functional component." Dr. Bailey changed the claimant's Percocet prescription to Opana ER and continued her Gabapentin and Mobic prescriptions. (R.383-84).

Dr. Bailey also reported on June 4, 2014, that the claimant tested positive for marijuana and informed her that if she tested positive at any point in the future for any illicit substance, he would be unable to continue prescribing her controlled substances. He referred her to pain psychology for assistance in developing coping skills. (R.384).

On June 23, 2014, Dr. Burel Goodin, a psychologist, evaluated the claimant. Dr. Goodin recommended that the claimant participate in cognitive behavioral management for her pain. The claimant declined to participate in a trial. On June 30, the claimant scheduled another visit to the pain psychologist after finding out that she could no longer visit her pain physician because of her refusal to participate in pain psychology. (R. 387, 392, 395).

On July 1, 2014, the claimant returned to Dr. Bailey. The claimant reported that Opana ER reduced her pain. On July 14, 2014, the claimant reported to Dr. Goodin that the new medication helped and rated her pain an eight out of ten. While discussing her functional status, the claimant reported to Dr. Goodin that her husband was hospitalized on July 3, 2014, which meant the claimant had been completing more chores around the house and driving herself. On August 6, 2014, while visiting Dr. Goodin, the claimant stated that the pain medications were not helping her pain and the MS Contin made her feel lethargic. She also reported that she spent the past four days lying down because her pain had flared. On August 27, 2014, the claimant reported that she "hurt so bad" after Dr. Bailey weaned her off MS Contin. She also claimed she was not able to engage in any significant physical activity and had been more irritated, depressed, and frustrated. (R. 397-99, 400, 403).

On August 29, 2014, Dr. Almeida recommended that the claimant participate in a Spinal Cord Stimulator Trial at UAB Medicine. The procedure was performed by Dr. Amar Patel on September 16, 2014. On a follow-up visit with Dr. Almeida on September 23, 2014, the claimant reported a decrease in pain to a seven out of ten. On October 21, 2014, the claimant reported minimal improvement from the SCS trial and that her pain increased to a ten out of ten after cessation of the trial. For the remainder of 2014 and through her last visit to the pain clinic on June 12, 2015, the claimant continued to rate her pain a ten out of ten during each visit. (R. 408, 416, 423, 433, 520, 554, 559).

*The ALJ Hearing*

After the Commissioner denied the claimant's request for disability insurance benefits and supplemental security income, the claimant requested and received a hearing before an ALJ on June 11, 2015. At the hearing, the claimant testified that she had not worked anywhere since August 12, 2013. She testified she took medications in the amounts prescribed. In addition to prescribed medications, she testified that she attended physical therapy twice, but stopped because of her eye surgery. She intended to start back the week following the hearing. The claimant testified that she had not failed to do any required treatment. (R. 13, 32-33, 47, 57).

When asked if any of her doctors had specifically restricted her functioning, the claimant testified that Dr. Almeida restricted her from lifting over five pounds with her right hand. She stated her doctors had not restricted her bending or use of her right upper extremity. The claimant testified that she could not work because she experienced constant pain daily, and when she takes medication, all she can do is sit or sleep. She has trouble sleeping and sometimes stays up for twenty-four hours; she can barely do house work and relies on her husband, who has

9

recently retired, to help her. Furthermore, she testified that not working was totally new to her and she never expected to be incapacitated at her age. (R. 34-36).

The claimant testified that she began seeing a psychologist because her inability to work was too hard for her. The ALJ commented that the claimant began visiting Dr. Goodin, the psychologist, because of her marijuana use. Dr. Goodin instructed the claimant to quit using marijuana if she wanted to continue to take pain medication. The claimant testified that she smoked marijuana once to help with her pain and quit afterwards. (R. 35-37).

When asked by the ALJ about driving to see her husband during his hospitalization, the claimant testified that she did not drive to see him. When the ALJ commented that her statements to Dr. Gooding indicated that she did, she stated that she only drove once. (R. 37).

A vocational expert, Carl Peacock, testified concerning the type and availability of jobs the claimant was able to perform. Mr. Peacock testified the claimant's past relevant work was as a driver supervisor, cashier, and dispatcher. Mr. Peacock testified that the driver supervisor position was classified as light and skilled; the cashier position as actually performed was classified as sedentary and unskilled; and the dispatcher position was classified as sedentary and semi-skilled. (R. 39-40).

The ALJ asked Mr. Peacock to consider a hypothetical individual the same age, level of education, and experience as the claimant who can perform sedentary exertion, but should not climb ladders, ropes, or scaffolds; cannot reach overhead with the dominant upper extremity; cannot work in concentrated exposure to extreme hot or cold temperatures, vibration, or other work hazards; can frequently climb ramps or stairs; and can occasionally stoop, kneel, crouch, or crawl. The individual would be taking narcotic pain medication. Mr. Peacock testified that the individual could work as a cashier, but not as a driver supervisor or dispatcher at the sedentary

exertional level. He also testified that the individual could perform other positions, such as information clerk, with 1,230 positions available in Alabama and 154,000 positions available nationally; ticket checker, with 930 positions available in Alabama and 102,000 positions available nationally; or washroom operator, with 1,160 positions available in Alabama and 128,000 positions available nationally. (R. 40-43).

When the ALJ asked about breaks, Mr. Peacock testified that standard breaks include three fifteen-minute breaks, a thirty-minute lunch, and two short breaks of three to five minutes. As for work absences, Mr. Peacock testified that, "[T]wo workdays would be consistent and is allowable. Anything more than that would not be." When asked by the ALJ if that is a hard line determination, he responded, "No, actually, the only published research indicated up to three days per month, but I think the standard from my experience has been somewhere [sic] two." (R. 44)

The claimant's attorney asked Mr. Peacock, "[I]f an employee were off task 20 to 30% of the day due to severe pain, how would that affect their ability to maintain employment?" Mr. Peacock answered, "They would be incapable of maintaining employment if they're off task at that level." (R. 44-45).

*The ALJ's Decision*

On October 26, 2015, the ALJ issued a decision finding that the claimant was not disabled under the Social Security Act. First, the ALJ found that the claimant met the insured status requirements of the Social Security Act through December 31, 2018, and had not engaged in substantial gainful activity since her alleged onset date of August 12, 2013. (R. 13, 21).

Next, the ALJ found that the claimant had the severe impairments of cervical degenerative disc disease with fusion of C4-5 and C5-6, and lumbar degenerative disc disease.

11

The ALJ noted that the claimant's medical records also indicated a history of obstructive sleep apnea, history of seizure disorder, hypertension, marijuana abuse, and rhinitis; however, the ALJ found that these impairments did not cause more than minimal limitation in the claimant's ability to perform basic work activities and were non-severe. (R. 15, 16)

The ALJ next found that the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ considered whether the claimant met the criteria for Listing 1.04 concerning disorders of the spine. The ALJ determined that the claimant did not document any spinal abnormalities necessary to satisfy Listing 1.04. The ALJ found "no evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss accompanied by sensory or reflex loss and positive straight-leg raising test; spinal arachnoiditis; or lumber spinal stenosis resulting in pseudoclaudication with inability to ambulate effectively." The ALJ further stated that no examining or treating medical source reported that the claimant had an impairment that satisfied a listed impairment. (R. 16)

Next, the ALJ determined that the claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a) except she could not climb ladders, ropes, or scaffolds, or reach overhead with her dominant upper extremity; she could not perform in concentrated exposure to extreme hot or cold temperatures, vibration, or work hazards; she could frequently climb ramps and stairs and occasionally stoop, kneel, crouch, and crawl; and she could not perform jobs that do not allow her to take narcotic medication. (R. 17).

In making this finding, the ALJ considered the claimant's symptoms and corresponding medical record. The ALJ concluded that although the claimant's medically determinable symptoms could reasonably be expected to cause symptoms, the claimant's allegations regarding the intensity, persistence, and limiting effects of these symptoms were not fully consistent with the evidence. The ALJ found that restrictions the claimant alleged appeared at least in part self-imposed and were not supported by the objective and clinical evidence. (R. 19).

To support his decision, the ALJ referenced the right shoulder MRI taken on June 17, 2013, which showed only a low-grade partial bursal surface tear; Dr. Okor's report from August 5, 2013, that stated the claimant's symptom severity was out of proportion to her cervical spondylitic changes; the post-surgical MRI from September 11, 2013, that showed that the claimant's spine alignment was within normal limits and no evidence of hardware loosening or failure; Dr. Okor's comment from December 11, 2013, that the nerve conduction studies were unremarkable; pain management notes that showed "her extreme limitations and pain in her right upper extremity could not be explained by objective medical studies"; examinations that demonstrate the claimant's normal gait pattern; the fact that she does not need an assistance device for ambulation; reports that state the claimant walks three to four times a week, which the ALJ considered "inconsistent with disabling back pain"; and medical notes that report improvements from pain medications. The ALJ stated, "While the claimant has been treated for neck and back pain, the record shows the claimant would be able to perform work at the sedentary exertional level, as set out in the residual functional capacity." (R. 19-20).

The ALJ gave little weight to Dr. Okor's opinion from September 11, 2013, that the claimant "is currently in no condition to work (this included sedentary duty), as she is constantly affected by pain. I recommended that she seek disability and she may require a referral to a pain

clinic for further management. I anticipate her dysphagia will improve with time." The ALJ also gave little weight to Dr. Okor's "Report of Disability" from October 4, 2013, that indicated that "the claimant is totally incapacitated for further performance of her job duties and she is incapacitated secondary to severe pain." The ALJ stated that Dr. Okor is a treating source pursuant to Social Security Ruling 96-2p, and therefore, his opinion is entitled controlling weight "as long as it is supported by medically acceptable clinical and diagnostic techniques and [is] not inconsistent with other substantial evidence." (R. 20).

The ALJ gave little weight to Dr. Okor's statements for three reasons. First, the ALJ stated that Dr. Okor's statements were inconsistent with diagnostic testing. The ALJ referenced medical notes where Dr. Okor reported that the claimant's alleged pain was out of proportion to the radiologic findings; her shoulder MRI and NCV were unremarkable; and her post-surgical MRI showed no evidence of hardware loosening or failure. Second, the ALJ stated that the statements were conclusory and regarded matters reserved to the Commissioner. Third, the ALJ stated that the statements were "less persuasive" because of the "potential objective of secondary gain."[1] Therefore, the ALJ found that the claimant was not disabled under the Social Security Act. (R.18, 20).

## VI. DISCUSSION

The claimant argues that the ALJ improperly discounted the claimant's subjective complaints and that the ALJ did not give proper weight to the opinions of the claimant's treating

---

[1] The ALJ alleges that the claimant requested a letter stating she was unable to work, and this request persuaded Dr. Okor to draft the "Report of Disability." However, Dr. Okor first stated that the claimant was unable to work on September 11, 2013. Two days later, on September 13, 2013, the claimant requested the letter. On October 4, 2013, Dr. Okor drafted the "Report of Disability." The ALJ incorrectly recounted the chronology of these events, and the actual chronology does not support the ALJ's finding that Dr. Okor's statements are less persuasive because of the potential objective of secondary gain. However, as the court explains in the discussion section, other substantial evidence supports the ALJ's decision to give Dr. Okor's opinion little weight.

physician. To the contrary, this court finds that substantial evidence supports the ALJ's decision and that the ALJ applied the appropriate legal standards to his evaluation of the claimant's subjective complaints and the opinions of her physician.

*Issue 1: The ALJ's Assessment of the Claimant's Credibility*

The claimant argues the ALJ did not properly credit her subjective complaints of the limiting effects of her pain. More precisely, the claimant argues that the ALJ failed to adequately consider the effects that the claimant's persistent pain had on her physical capabilities. This court disagrees and finds that the ALJ properly discredited the claimant's subjective complaints.

In discrediting the claimant's subjective testimony, the ALJ articulated reasons for doing so and substantial evidence supports those reasons. *See Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991). The ALJ concluded that, although the claimant's medically determinable impairments could reasonably be expected to cause symptoms, the claimant's allegations regarding the intensity, persistence, and limiting effects of those symptoms were not fully consistent with the evidence. The ALJ cited a shoulder MRI and a nerve conduction study which were both considered "unremarkable," and a post-surgical cervical MRI considered "within normal limits" and that "showed no evidence of hardware loosening or failure." The ALJ also referenced medical notes that showed that the claimant's gait was normal and that she could heel, toe, and tandem walk without difficulty. He also referenced medical documents showing that the claimant walked three to four times per week, and the ALJ found that activity inconsistent with disabling back pain. The ALJ also discussed the claimant's use of medications and referenced parts of the record that showed the claimant improved from medication. (R. 17, 19-20).

The ALJ also referenced statements made by the claimant's doctors to support his decision. He cited Dr. Okor's report that the claimant's symptom severity was out of proportion

15

to her cervical spondylitic changes and pain management notes that stated the claimant

"exhibited 'severe' pain behaviors and . . . [the] extreme limitations and pain in her right upper

extremity could not be explained by objective medical studies." (R. 19-20).

The court finds that substantial evidence supports the ALJ's determination that the

claimant's subjective complaints were inconsistent with other evidence in the record.

Consequently, the ALJ properly discredited the claimant's subjective complaints.

*Issue 2: The ALJ's Assessment of the Treating Physician's Opinions*

The claimant next argues that the ALJ failed to accord proper weight to the opinions of

the claimant's treating physician, Dr. Okor. This court finds that the ALJ properly articulated his

reasons for discrediting the opinions of Dr. Okor and that substantial evidence supported these

reasons.

If the ALJ articulates specific reasons for not giving the opinion of a treating physician

controlling weight and substantial evidence supports those reasons, the ALJ does not commit

reversible error. *Moore*, 405 F.3d at 1212. The ALJ in this case clearly articulated his reasons for

discrediting the opinion of the claimant's treating physician, Dr. Okor. The ALJ gave little

weight to Dr. Okor's statement from September 11, 2013, where Dr. Okor stated "the claimant is

currently in no condition to work . . . as she is currently affected by pain" and Dr. Okor's

"Report of Disability" from October 4, 2013, where he stated that the claimant is totally

incapacitated for further performance of her job duties. The ALJ gave these statements little

weight because they were inconsistent with the diagnostic testing and they were conclusory and

concerned matters reserved to the Commissioner.

Substantial evidence supports the ALJ's finding that Dr. Okor's statements regarding the

severity of the claimant's symptoms are inconsistent with diagnostic testing. In June 2013, Dr.

Okor stated that the claimant's symptoms were more substantial than could be explained by her cervical radiologic pathology and that her right shoulder MRI was unremarkable. On August 5, 2013, Dr. Okor stated that the claimant's symptom severity was out of proportion to her cervical spondylotic changes and her shoulder MRI and NCV were rather unremarkable. On September 11, 2013, following the claimant's surgery, Dr. Okor noted that a radiograph demonstrated an intact internal fixation construct without evidence of hardware pullout or loosening. Dr. Okor's diagnostic testing does not support his finding that the claimant's severe pain prevents her from working. Therefore, the ALJ correctly gave Dr. Okor's statements little weight.

Additionally, the ALJ correctly found that Dr. Okor's statements regarding the claimant's ability to work are conclusory and concern a matter reserved to the Commissioner. Dr. Okor stated that the claimant was currently in "no condition to work" and recommended that she seek disability. These statements are not medical opinions, but are, instead, opinions on issues reserved to the Commissioner. The Commissioner has the responsibility of determining whether the claimant meets the statutory definition of disability. *See* 20 C.F.R. §§ 404.1527(d), 416.927(d); *Denomme v. Comm'r, Soc. Sec. Admin.*, 518 F. App'x 875, 877 (11th Cir. 2013) ("[T]he Commissioner, not a claimant's physician, is responsible for determining whether a claimant is statutorily disabled."). Moreover, Dr. Okor's statements were in 2013, two years before the ALJ's decision. Therefore, the ALJ correctly gave Dr. Okor's statements little weight.

The ALJ explicitly detailed his reasons for finding that Dr. Okor's opinion was inconsistent with the evidence of record and substantial evidence supported these reasons. Thus, this court finds that the ALJ did not commit reversible error in failing to give substantial weight to Dr. Okor's opinion.

## VII. CONCLUSION

For the reasons stated above, this court concludes that substantial evidence supports the Commissioner's decision. Accordingly, this court AFFIRMS the decision of the Commissioner. The court will enter a separate order to that effect simultaneously.

DONE and ORDERED this 5th day of September, 2018.


_____
**KARON OWEN BOWDRE**
CHIEF UNITED STATES DISTRICT JUDGE